# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

SEALED

| United States of America | |
|---|---|
| v. | Case Number: 18-7284/MJ |
| Tso Li, a.k.a Michael Wilson, a.k.a. Richard Lee. | **(Filed Under Seal)** |

## CRIMINAL COMPLAINT

I, Nicholas Barabatis, the complainant in this case, being duly sworn, state that the following is true to the best of my knowledge and belief.

### COUNT ONE

Beginning on or about December 12, 2016, and continuing until on or about January 30, 2018, in the District of Arizona and elsewhere, Tso Li, a.k.a. Michael Wilson, a.k.a. Richard Lee, and others unknown, knowingly and willfully agreed, combined, and conspired with each other, to export or cause to be exported from the United States to the People's Republic of China (1) Triquint radiation-hardened power amplifiers, bearing part number TGA2573-2, and (2) Intersil radiation-hardened supervisory circuits, bearing part number ISL705ARHVF, without having first obtained the required license from the United States Department of Commerce for authorization to export those items.

In violation of Title 50, United States Code, Section 1705(a) and (c); Title 15, Code of Federal Regulation, Sections 742.4, 764.2, 774, Supp. No. 1.

### COUNT TWO

Between on or about December 12, 2016, and on or about March 23, 2018, in the District of Arizona and elsewhere, Tso Li, a.k.a. Michael Wilson, a.k.a. Richard Lee did knowingly and willfully buy (1) Triquint radiation-hardened power amplifiers, bearing part number TGA2573-2, and (2) Intersil radiation-hardened supervisory circuits, bearing part number ISL705ARHVF, prior to exportation, knowing the same to be intended for exportation without a license contrary to the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Sections 1701-1706, and the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774, laws and regulations of the United States.

In violation of Title 18, United States Code, Sections 554(a) and 2.

I further state that I am a Special Agent from U.S. Immigration and Customs Enforcement, Homeland Security Investigations (HSI) and that this complaint is based on the following facts:

**See Attached Statement of Probable Cause Incorporated By Reference Herein.**

Continued on the attached sheet and made a part hereof:     ☒ Yes     ☐ No

AUTHORIZED BY: Todd M. Allison, AUSA

SA, Nicholas Barabatis

Name of Complainant

Signature of Complainant

Sworn to before me and subscribed in my presence

Date   8/14/18     at   Phoenix, Arizona

City and State     1:00 p.m.

HONORABLE BRIDGET S. BADE
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

## STATEMENT OF PROBABLE CAUSE

I, Special Agent Nicholas Barabatis, upon being duly sworn, do hereby state that the following is true to my knowledge and belief:

1.      I am a Special Agent with Homeland Security Investigations (HSI) and have been so employed for approximately eight years. Prior to my employment with HSI, I was employed by the City of Tempe as a Police Officer for five years. As a requirement for employment as an HSI Special Agent, I successfully completed a 12-week Criminal Investigator Training Program (CITP) located at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. After CITP, I completed an additional 12-week Immigration and Customs Enforcement Special Agent Training Academy. During training at FLETC, I received extensive instruction in the areas of Immigration law, Customs law, firearms training, rules of evidence, and interview techniques.

2.      As a Special Agent with HSI, my duties include, among other things, the investigation of criminal violations of import/export law and violations of the Arms Export Control Act ("AECA") as proscribed by 22 U.S.C. § 2778, and the International Trafficking in Arms Regulations ("ITAR"), as proscribed by 22 C.F.R Part 120, *et. seq.* Additionally, I am authorized to investigate criminal violations of export law and violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707. Furthermore, your Affiant is familiar with the Export Administration Regulation ("EAR"), listed under the Export Administration Act ("EAA") as proscribed by 15 C.F.R. §§ 730-744, that regulates the export of strategic dual use goods and technologies from the United States. Moreover, as an HSI Special Agent, your Affiant is generally authorized to investigate violations of the laws of the United States and to execute search and seizure warrants issued under the authority of the United States.

3.      Your Affiant is familiar with federal criminal laws relating to the unlawful export of arms and commodities from the United States, as determined by the Department of State (DoS), Directorate of Defense Trade Control (DDTC), the Department of Commerce (DoC), Bureau of Industry and Security (BIS), and the Department of Treasury,

1

Office of Foreign Asset Controls (OFAC), as these agencies have statutory responsibility and authority to regulate this area. *See* 22 U.S.C. § 2778; 22 C.F.R. § 120 *et seq.*

4.       This affidavit is based upon information I gained through training and experience, as well as information related to me by other individuals, including other law enforcement officers.  Since this affidavit is being submitted for the limited purpose of demonstrating probable cause sufficient for the issuance of a criminal complaint, I have not included each and every fact known concerning this investigation.  For the reasons set forth below, I assert there is probable cause to believe that Tso LI (hereinafter, "LI") has committed a violation of Title 50, United States Code, Sections 1701-1705 (the International Emergency Economic Powers Act ("IEEPA")), and Title 18, United States Code, § 554 (Smuggling Goods from the United States).

## EXPORT LAWS AND REGULATIONS

### A. The International Emergency Economic Powers Act (IEEPA)

5.       Under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701-1707, the President of the United States is granted authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.  The President, under IEEPA, can declare a national emergency through executive orders that have the full force and effect of law.

6.       On August 17, 2001, under the authority of IEEPA, the President issued Executive Order 13222, which declared a national emergency with respect to the unrestricted access of foreign parties to U.S. goods and technologies, and extended the Export Administration Regulations (EAR), 15 C.F.R. §§ 730-774.  The President has issued annual Executive Notices extending the national emergency declared in Executive Order 13222 from the time period covered by that Executive Order through the present. *See, e.g.,* 82 Fed. Reg. 39005 (Aug. 15, 2017).

7.       Pursuant to Executive Order 13222, the United States Department of Commerce (DoC) reviews and controls the export of any item warranting control that is not exclusively controlled for export, re-export, or transfer (in-country) by another agency.

2

In particular, the EAR restricts the export of goods and technology that could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. The EAR imposes licensing and other requirements for items subject to the EAR to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another. The most sensitive items subject to EAR controls are identified on the Commerce Control List, or "CCL," published at 15 C.F.R. § 774, Supp. No. 1. Items on the CCL are categorized by Export Control Classification Number (ECCN), each of which has export controls requirements depending on destination, end use, and end user.

8.      Pursuant to IEEPA, "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," 50 U.S.C. § 1705(a), and "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime, 50 U.S.C. § 1705(c).

**B. Smuggling, or Attempting to Smuggle, Goods from the United States**

9.      It is illegal to fraudulently or knowingly export or send from the United States, or attempt to export or send from the United States, any merchandise, article, or object, contrary to any law or regulation of the United States, or receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of such merchandise, article or object, prior to exportation, knowing the same to be intended for exportation contrary to any law or regulation of the United States. 18 U.S.C. § 554, § 2.

## PROBABLE CAUSE

**A. LI, Using the Alias, "Michael Wilson," Attempts to Purchase Radiation-Hardened Electronic Components from UC-1.**

10.      On December 12, 2016, HSI Phoenix, Arizona, received information from an Industry Source (hereinafter, "the IS") regarding a suspicious request from a Hong Kong company for a quote for space and military grade electronics. The IS informed HSI that

3

an individual using the name, "Michael Wilson," who HSI later determined to be LI, requested a quote for the following quantities and part number:

    a. 50 military-grade power amplifiers under part number TGA2573-2, manufactured by TriQuint (hereinafter, "TGA2573-2");

    b. 135 radiation-hardened analog switches under part number HS1-201HSRH-Q, manufactured by Intersil (hereinafter, "HS1-201HSRH-Q"); and,

    c. 100 radiation-hardened supervisory circuits under part number ISL705ARHVF, manufactured by Intersil (hereinafter, "ISL705ARHVF").

11.    According to the IS, LI advised that the items were destined for the People's Republic of China (PRC), but his (LI's) company, which he identified as "Strategic Electronics Corporation," was in Hong Kong.  LI identified himself to the IS as a "Purchase Manager" for" Strategic Electronics Corporation" and provided a telephone number with a Hong Kong prefix.

12.    Your Affiant knows that all three of the components sought by LI are used in military and aerospace applications due to their ability to withstand high temperatures such as those encountered in space and high-altitude flight.  In addition, all three components have been assigned an Export Control Classification Number (ECCN) by the DoC that prohibits the export to the PRC.

13.    The IS requested that LI identify the end user—information that is necessary to apply for the appropriate export license with the DoC—but LI refused, stating he was unable to provide any further information regarding the end user.  At that point, the IS provided LI's contact information to an undercover law enforcement agent (hereinafter, "UC-1") and sent an email to LI introducing UC-1 as a member of the IS's business.  UC-1 was using the IS's email server to appear as if UC-1 worked for the IS.  After it was apparent that LI wanted to conduct an illegal transaction, UC-1 provided LI with a second undercover email account to LI and told LI that UC-1 would prefer to communicate through a personal email account, not a work email account.

14.     Upon receiving the information from the IS in December 2016, your Affiant conducted an open source search of "Strategic Electronics Corporation" and could not find any information regarding the company.  An open source internet database search of the telephone number provided by LI revealed the number was listed for a large retail store in Hong Kong.

15.     On or about December 12, 2016, UC-1 sent an email to LI and asked him for the destination of the requested items.  On the same date, UC-1 received a response from LI that stated that LI's company is in Hong Kong and the end user was in PRC.  LI emphasized that the items would be shipped to Hong Kong.  Below is the body of the December 12, 2016 email received by UC-1 from LI.

> Hello [UC-1],
>
> Thanks for your kindly response!
>
> Regarding your request, our company is located in HongKong, and end user is located in China, and all products will be shipping to HongKong, I can only tell you these information, so pls let me know if you can supply these items???
>
> Awaiting for your earliest reply, so that we can proceed this order!
>
> Have a great day!
>
> Best regards,
> Michael

16.     On or about December 13, 2016, UC-1 sent an email to LI explaining that LI would need to identify the end user to apply for the appropriate export licenses.  LI replied that he was unable to send the details regarding the end user and reiterated that the items would be shipped to Hong Kong.

17.     Between December 13, 2016 and December 15, 2016, UC-1 and LI exchanged a series of emails discussing the requirements to legally export the requested items.  In summary, UC-1 informed LI that shipping the requested components without a

license was illegal. LI responded by stating that he was aware of the requirement for the license and told UC-1 to "find a enduser & apply for it." LI also acknowledged that the "products" were controlled by the United States government and based on LI's intended end user it would be "impossible" to obtain a license. LI continued to say that his only concern was the receipt and quality of the components.

18.     On or about December 14, 2016, UC-1 sent an email response to LI requesting clarification that LI was asking UC-1 to fabricate an end user to obtain an export license. UC-1 told LI that they could "get in trouble and there is substantial risk involved." UC-1 advised LI that, "We would need to discuss additional payment for this risk."

19.     On or about December 15, 2016, UC-1 received an email from LI that stated he was aware of the export license requirements for the items he was requesting. LI explained that he did not believe UC-1 would be able to get a license if he provided the end user information. LI confirmed that UC-1 should create an end user to obtain a license. LI ended by stating that he was not concerned about the license but concerned on the shipping method used by UC-1. Below is the body of the December 15, 2016 email sent to UC-1 by LI.

Hello [UC-1],

Thank you very much for your kindly response my friend!

First, I know what you mean, BUT,I really can't tell the enduser's information to you, hope you can understand! As you know,these products are controlled by the US Government, it need export license to sell out of USA, especially controlled to China, so even if I sent enduser's (China) information to you, it is impossible to apply for export license successful, so I suggestion that you can find a enduser, and offer the enduser's information to apply for export license, on the other hand, no matter if you apply for export license or not, if you have a method to get the product & shipping to HongKong, it is ok!!!

By the way, we are highly appreciate to establish directly & long term business relation with your company!

Awaiting for your good news, so that we can proceed this order!  Have a great day!

Best regards,
Michael

20.      On or about December 19, 2016, UC-1 sent an email to LI with a quote for the two Intersil parts requested by LI (Part Nos. ISL705ARHVF and HS1-201HSRH-Q) and added a 10% risk fee.  UC-1 concluded by stating, "You were correct both Intersil parts are restricted to China dependent on end user.  Are you sure you don't want to supply end user and try to obtain the license?  If this works I can do this for you several times and it will be good business for us all."

21.      On or about December 20, 2016, UC-1 followed up with a quote for the third item requested by LI, TriQuint Part No. TGA2573-2, and added a 10% risk fee.  UC-1 then received an email from LI, who restated that his only concern was receiving the parts and stated that he had used other U.S. vendors who had shipped items to LI.  Below is the content of the December 20, 2016 email sent to UC-1 by LI in its entirety.

Hello [UC-1],

Thank you very much for your kindly response my friend!

Regarding your request, as I told you before,no matter if you apply for export license or not, as long as you have a good method to get the product & shipping to HongKong safety it is ok! and all of our US vendor, which have their own methods to shipping these kinds of products to HK safety,as for how to shipping to HK & safety, we never ask, pls note it!

If any further questions, pls do not hesitate to contact me.

By the way, once you get response for triquint product, pls let me know!

Have a good day!

Best regards,
Michael

22.     On or about December 21, 2016, UC-1 received an email from LI, in which LI acknowledged that the components he was requesting were controlled by the United States government for export to the PRC. LI asked if UC-1 had set up a method to ship to Hong Kong and inquired about the risk fee. Below is the body of the December 21, 2016 email sent to UC-1 by LI.

Hello [UC-1],

Thank you very much for your kindly response my friend!

Regarding your feedback, pls help us check below questions, so that we can proceed this order, thanks!

1.   As you know, these products are controlled by US government, especially to China, can you pls help me check & let me know clearly if you have a good method to shipping the product to Hongkong safety???
2.   Pls let me know the lead time for Triquint product?
3.   Can you pls let me know what's mean for plus 10% Risk Fee for each items?

Awaiting for your definite & earliest reply! Have a great day!

Best regards,
Michael

23.     On or about December 21, 2016, UC-1 sent an email to LI which explained that the transaction was illegal and UC-1 would require a "risk fee" to compensate UC-1 for the risk of conducting an illegal export. Part of UC-1's email stated,

Since the parts are restricted to China we could both get in trouble with US Customs for shipping without a license as it is illegal. But since I am in the US and you are in China, I am the one that takes all the risk. I could go to jail and since I am doing this without [IS] knowing I could also lose my job. That is why I need extra money for taking the risk for smuggling out of the US to you.

24.     On or about December 22, 2016, UC-1 and LI exchanged a series of emails regarding smuggling the items to Hong Kong. UC-1 asked LI for information as to how other U.S. vendors had helped LI send export-controlled items to the PRC in the past, as LI had indicated in his prior email. LI responded to UC-1 in an email, in which LI stated

he had been told by another U.S. vendor that the vendor would transship the items through another country before sending them to Hong Kong. LI told UC-1 that the U.S. vendor did not tell LI how exactly the items were shipped. LI ended by asking for the method UC-1 would use to get the items to Hong Kong. LI would not identify the other U.S. vendors he had worked with in the past. Below is the body of the December 22, 2016 email sent to UC-1 by LI.

Hello [UC-1],

Thanks for your kindly response my friend!

Regarding your request, I have check with our US vendor, and responsed that they first shipping the products to any third countries, then shipping the products to HongKong from the third countries, as for how to shipping these products to the third countries & HK,our vendor did not told us, pls check it!

As you mentioned in emails, your shipping method is "you will shipping these products along with other intergrated circuits that are not controlled to China", no matter what kind of shipping methods, as long as you can ensure that you can shipping these products to HongKong safety,I think that they are both good methods, do you think so?

Another questions, Can you pls let me know clearly if you have ever shipping these products to HongKong by the method you told??? and let me know clearly if you can sure that you can shipping these products to HongKong safety by the method???

Finally, to your questions, once the products arrived Hongkong, you need not worried about anything, we will deal with all things in HongKong, pls check it!

Awaiting for your definite & earliest reply! Have a great day!

Best regards,
Michael

25.      Your Affiant knows, based on training and experience, that Hong Kong is a commonly used transshipment point due to the high volume of cargo that passes through the port. This high volume makes it difficult to detect contraband, fictitious manifests and contraband. Additionally, due to the proximity of Hong Kong to mainland China, it is

common for smugglers to ship to Hong Kong and use non-commercial methods to transport the items to China making it difficult to track the ultimate destination.

26.     Between December 22, 2016, and February 22, 2017, UC-1 and LI exchanged a series of emails regarding the items requested by LI, possible smuggling methods, and a payment schedule.   UC-1 continued to warn LI that their transaction was illegal and that UC-1 could go to jail if caught.

27.     During the negotiations, LI advised UC-1 on multiple occasions that LI was consulting, and being directed by, at least one other individual in his dealings with UC-1. LI often referred to this individual as his "director." For example, on January 10, 2017, LI sent an email to UC-1 in which LI advised, "Regarding your latest email, our company have a meeting this morning, finally, I have try my best to convince Our Director to trust you & your company, and agreed to start our business from this order . . . ." In a January 12, 2017 email to UC-1, LI explained, "Regarding your proposal, I have check with our director, and have try my best to convince our director to make further concessions . . . ."

28.     On or about January 12, 2017, LI proposed an order for just 50 of the TriQuint military-grade power amplifiers , Part No. TGA2573-2, a much smaller order than LI had originally requested because LI appeared to no longer be requesting the Intersil parts he initially requested (the radiation-hardened analog switches, Part No. HS1-201HSRH-Q, and the radiation-hardened supervisory circuits, Part No.  ISL705ARHVF).  In an January 12, 2017 email to UC-1, LI indicated he was working with other individuals, including his "customer."  Specifically, LI wrote, "As I told you before, we will place an order to you for 1 item first time, and we have discussed with our customer this morning, finally, our customer are willing to try to place an order (50pcs of TGA2573-2), if this deal is successful, I'm sure that we will place more & more order to you in 2017, pls note it!"

29.     On February 22, 2017, UC-1 received an email from LI.  Attached to the email was a purchase order agreement that listed 50 of the TriQuint military-grade power amplifiers, Part No. TGA2573-2, the proposed unit price ($336.23), and the proposed payment terms.  In the purchase order agreement, LI agreed to pay a 10% risk fee of the

total invoice combined with the last payment. According to the terms outlined in the purchase order, LI would pay 30% at the time of the order, 30% prior to UC-1 shipping the items out of the United States, and 40% after the items arrived in Hong Kong. The total invoice including the risk fee was $16,811.50. The purchase order document listed the billing name as "Shaanxi Nick Import & Export Co. LTD," with an address in Xi'an City, China 710065. After receiving the purchaser order, your Affiant conducted a check of public databases and located a company called Shaanxi Nick Machinery Equipment Co., Ltd. According to a public website, Shaanxi Nick Machinery Equipment Co., Ltd. manufactures and exports paper balers and presses and is in Xi'an, Shaanxi Province, China. The purchase order also listed the contact for "Shaanxi Nick Import & Export Co. LTD" as "Michael," and listed a telephone number with the country code for PRC and Xi'an City area code. Your Affiant searched public and government databases but did not locate any information regarding the telephone number. Lastly, the purchase order listed the buyer as "Richard Lee."

30.     Over the course of undercover communications between UC-1 and LI, UC-1 asked LI for an alternate email account for LI that UC-1 could contact to discuss their illegal activity. The UC-1 asked for an alternate email account to appear as if UC-1 was legitimately employed and was attempting to conduct this illegal transaction without the knowledge of his legitimate employer. LI provided UC-1 with an alternate email account, and throughout LI's communications with UC-1, LI used both email accounts interchangeably, often beginning an email conversation with one email address and continuing it with the other email address.

31.     On March 23, 2017, U.S. Magistrate Judge Eileen S. Willett issued a warrant (Warrant No. 17-9130MB) in the District of Arizona authorizing the search of both email accounts LI had used to communicate with UC-1, strategicelectcorp@outlook.com and m.wilson168@outlook.com. On March 24, 2017, your Affiant served the search warrant on Microsoft Corporation. On July 14, 2017, however, Microsoft Corporation advised your Affiant that the contents of LI's email accounts were stored outside of the United

States and therefore were outside the scope of the warrant. As a result, your Affiant never received any data in the search warrant returned from Microsoft Corporation.

32.     Between February 22, 2017, and April 21, 2017, UC-1 and LI exchanged a series of emails over both email accounts provided by LI. Over the course of these email communications, UC-1 and LI continued to negotiate terms of an order, to include payment terms.

33.     On or about April 21, 2017, UC-1 received an email from LI that stated his "boss" had agreed to place an order with UC-1. Below is the body of the email sent to UC-1 by LI.

Hello [UC-1],

Hope this email find you & your family well my friend!

I have a good news to you, after so many efforts & convince, our Boss have final agreed & willing to trust you & try to place an trial order to you, as to which parts we will place, our Boss haven't made a final decision yet, anyway, my friend, I will let you know as soon as possible once I got final decisions, pls check it!

By the way, my friend, As we agreed before about the commission, 10% commission for the first order, after complete the first deal, we can further discuss for the commission, any questions about the commissions?

Have a great day!

Best regards,
Michael

34.     On or about April 26, 2017, UC-1 received an email from LI with a change to the last proposed order of 50 TriQuint military-grade power amplifiers, Part No. TGA2573-2. Instead, LI now requested 25 TriQuint military-grade power amplifiers, Part No. TGA2573-2 and 30 Intersil radiationhardened supervisory circuits, Part No. ISL705ARHVF. On April 26, 2017, LI sent an amended purchase order for these items, listing a total invoice of $19,205.75. This total amount also included the 10% risk fee

($1,921.00), which would be paid to UC-1 along with the last payment. The amended purchase order had the identical billing company, billing address, and buyer as the initial purchase order. The shipping address was listed as "TBD."

35.     On May 3, 2017, UC-1 received an email from LI stating that LI had sent the amended purchase order to his "boss" to sign. LI told UC-1 that he was trying to convince his "boss" to release the first payment.

36.     At some point during the conversations, UC-1 suggested that UC-1 and LI participate in a face-to-face meeting through a Skype video call. LI provided UC-1 with a Skype ID of "aerospace_ic" (hereinafter, "LI's First Skype Account"). On May 5, 2017, UC-1 conducted a recorded Skype video call with LI, using LI's First Skype Account, to discuss the payment and the amended purchase order.   During the video-recorded call, UC-1 proposed a job opportunity to LI to travel to the United States and work as an interpreter for UC-1's company. During the Skype video call, UC-1 was able to see LI's face, and HSI was able to capture multiple still photographs of LI. During the Skype video call, LI told UC-1 that he had wired the initial payment to UC-1. The amount was the first payment of the total invoice of the items detailed in LI's purchase order. UC-1 provided LI with an 18-week production time and a shipping date in September 2017. That same day, LI sent an email to UC-1 confirming that he sent the payment. Below is the body of an email sent to UC-1 by LI.

Hello [UC-1],

I'm glad to talk with you on skype my friend!

Regarding the first payment, our forgin exchange payment company have arranged money to you this afternoon, pls check it!

By the way, my friend, pls start to deal with this order & arrange production ASAP!

Have a great day!

Best regards,

Michael

37.     On the same date, May 5, 2017, HSI Phoenix received a wire transfer of $5,742.00 into an HSI Phoenix-controlled undercover bank account located in Phoenix, Arizona. The wire transfer records show that the transfer came from "SHANGHAI PAN LONG IMPORT" through the Hong Kong and Shanghai Banking Corporation (hereafter, "HSBC"). The "bill to" contact name for the amended purchase order was "Michael," and the amended purchase order was signed by "Richard Lee." UC-1 also received an email from LI with an attached wire transfer form from HSBC that listed UC-1's undercover business and the HSI-controlled undercover bank.

38.     Your Affiant believes that LI used an import/export company, Shanghai Pan Long Import & Export Co. Ltd., to conceal the identity of the ultimate end user and LI's company. It is not uncommon for an importer to hire an import company, also called an intermediary, to facilitate the import of goods. In this instance, your Affiant believes LI paid the import/export company a fee and provided them with the proceeds to pay the undercover bank account to conceal the end user. Your Affiant has learned from agents who are assigned to HSI Attaché Beijing that the PRC does not share shipping or company records with the U.S. government to further investigations. Therefore, there is no way for your Affiant to obtain records from Shanghai Pan Long Import & Export Co. to identify the source of the funds.

39.     On June 27, 2017, United States Magistrate Judge Eileen S. Willett in the District of Arizona signed an order pursuant to 18 U.S.C. § 2703 for subscriber records and transactional data associated with LI's First Skype Account. Your Affiant reviewed the subscriber information and learned that LI's First Skype Account was linked to LI's email account under Strategic Electronics Corporation, and the account was created in the PRC on May 16, 2014.

40.     Between September 2017 and December 26, 2017, UC-1 exchanged a series of emails with LI regarding the shipment. LI became agitated that UC-1 had not delivered the items and demanded UC-1 send ten of the TriQuint military-grade power amplifiers,

Part No. TGA2573-2 to Huashun International Logistics Co. Ltd., located in Hong Kong. HSI investigators assigned to the U.S. Embassy in Hong Kong conducted a site visit of Huashun International Logistics Co. Ltd., which revealed the address was a corporate office building. The HSI investigator confirmed that Huashun International Logistics Co. Ltd. was not listed on the company directory. HSI investigators also located the exact office within the corporate building that LI had provided to UC-1 and determined that the office was empty. UC-1's last contact with LI was on March 23, 2018. In the March 23, 2018 email, LI threatened to report UC-1 and his company for breaking the law.

## B. HSI Confirms that Licenses Are Required to Export both Components LI Purchased from UC-1 and that both Components Are Subject to Either a Policy or a Presumption of Denial for Export to China.

41.      During the investigation, HSI was able to obtain license determinations United States Department of Commerce, Bureau of Industry and Security (BIS) for both parts that LI purchased from UC-1, the TriQuint military-grade power amplifiers, Part No. TGA2573-2, and the Intersil radiation-hardened supervisory circuits, Part No. ISL705ARHVF.

42.      On or about January 9, 2017, your Affiant conducted a search of government databases and learned that, on December 15, 2016, an HSI Los Angeles agent received a license determination from BIS for Part No. ISL705ARHVF.   According to BIS, the radiation-hardened supervisory circuits have an Export Control Classification Number (ECCN) of 9A515.e.1.   Under the Commerce Control List (CCL), Category 9A515 describes export controls for "Spacecraft and related commodities." The license determination states that "there is a "policy of denial for 9A515 items going to China." Your Affiant knows that any items classified under 9A515 is subject to a policy of denial based on 15 C.F.R. § 742.4(b)(iii), which states, "When destined to the People's Republic of China . . ., items classified under any 9x515 ECCN will be subject to a policy of denial." Intersil Part No. ISL705ARHVF is manufactured by Intersil/Renesas Electronics America Inc., a Japanese company with a manufacturing plant in California.

43.     On April 6, 2017, your Affiant received a license determination from the BIS regarding the export of TriQuint military-grade power amplifiers, Part No. TGA2573-2. TriQuint Part No. TGA2573-2 has an Export Control Classification Number (ECCN) of 3A611.x and is controlled.  Under the Commerce Control List (CCL), Category 3A611 describes export controls for "Military Electronics."  The license determination states that, for TriQuint Part No. TGA2573-2, there is a "presumption of denial for license applications to export, reexport, or transfer items that would make a direct and significant contribution to the People's Republic of China's military capabilities."  Part No. TGA2573-2 is manufactured by TriQuint/Qorvo, a U.S. company based in North Carolina.

## C.  LI, Using the Alias, "Richard Lee," Contacts HSI and Attempts to Purchase Radiation-Hardened Electronic Components from UC-2 and UC-3.

44.     On October 2, 2017, two HSI undercover law enforcement agents (hereinafter, "UC-2" and "UC-3," or collectively as the "HSI UCs") received an unsolicited email from LI, who identified himself this time as "Richard Lee."  LI requested a quote for 30 Intersil radiation-hardened supervisory circuits, Part No. ISL705ARHVF.  Additionally, LI requested a quote for 30 radiation-hardened programmable memory chips, manufactured by Cobham under part number UT28F256QLET-45UCC.  Intersil Part No. ISL705ARHVF is the exact same part that LI, using the alias, "Michael Wilson," had tried to purchase from UC-1.  Your Affiant believes that LI located the HSI UCs' information from HSI Phoenix's undercover business that has a public website.  Your Affiant knows that Cobham Part No. UT28F256QLET-45UCC is a radiation-hardened programmable memory chip designed to survive in harsh environments, including extreme temperatures, excessive vibrations, and radiation exposure, and as a result, it is utilized specifically for space applications.

45.     In his October 2, 2017 email to the HSI UCs, LI used an email signature line that listed his title as, "Procurement Manager," and his employer as, "Nick International Limited."  LI provided the HSI UCs with a telephone number of +852-2721-0168.  On or about October 3, 2017, your Affiant conducted a check of open source internet databases,

which revealed that the telephone number provided by LI was registered to a jewelry story in Hong Kong. Your Affiant was unable to locate "Nick International Limited" as a legitimate company during a search of open source internet indices.

46.     Your Affiant conducted a search of government databases and learned that, on April 6, 2017, the BIS issued a license determination regarding Cobham Part No. UT28F256QLET-45UCC. The radiation-hardened programmable memory chip, Cobham Part No. UT28F256QLET-45UCC has an ECCN of 9A515.e.2, and as a result, there is a "policy of denial for 9A515 items going to China." Your Affiant knows that Cobham is a United Kingdom company that manufactures Part No. UT28F256QLET-45UCC in Colorado Springs, Colorado.

47.     Between October 2, 2017, and November 1, 2017, UC-2 and LI exchanged a series of emails. During these email exchanges, LI told UC-2 that the requested items would be shipped to Hong Kong. UC-2 provided LI with a quote and a purchase order for Cobham Part No. UT28F256QLET-45UCC and Intersil Part No. ISL705ARHVF. LI requested the payment terms for the order, and UC-2 responded by stating, "As for payment terms, because you are a first time client and this order is below our financing threshold payment is 100% in advance via wire transfer." UC-2 informed LI that both Cobham Part No. UT28F256QLET-45UCC and Intersil Part No. ISL705ARHVF would need an export license and requested LI identify the end user. LI sent an email responding to UC-2's question by stating, "As for the license you mentioned, our company hope that you can find a way to get it . . . ." LI did not specifically address UC-2's question regarding the end user. UC-2 requested a voice/video Skype call to discuss the issue with LI and clarify LI's response. LI agreed to speak over Skype, and UC-2 provided LI with a Skype ID. On or about October 31, 2017, UC-2 received a message over Skype messenger from LI who was using Skype ID "txckj_leo" (hereinafter, "LI's Second Skype Account"), asking that he be added to UC-2's contact list.

48.     On November 1, 2017, the UCs tried to conduct a recorded Skype video call over LI's Second Skype Account. However, LI claimed he was unable to use the video

feature, but agreed to speak over Skype voice. During the recorded audio call, LI acknowledged that Intersil Part No. ISL705ARHVF and Cobham Part No. UT28F256QLET required an export license to be exported from the United States. LI also acknowledged that he understood that the HSI UCs would get in trouble if they got caught sending Intersil Part No. ISL705ARHVF and Cobham Part No. UT28F256QLET to the PRC without a license. During the conversation, LI voluntarily offered to pay the HSI UCs a "risk fee." LI told the HSI UCs that it would be their responsibility to get the items to Hong Kong. LI ended the discussion by informing the HSI UCs that he recently lost money to a U.S.-based distributor. UC-2 asked LI to identify the U.S.-based distributor, and LI agreed to send the details in an email.

49.     On or about November 2, 2017, the HSI UCs received an email from LI that summarized their Skype conversation the previous day. LI admitted in the email that he was aware of the export license requirements and asked the HSI UCs how they were going to get the items to Hong Kong if they were unable to obtain an export license. Below is the body of the November 2, 2017 email the HSI UCs received from LI.

Dear [UC-2, UC-3],

I'm so glad to talk with you on Skype!

With regards to our conversations, before I make a report to our Boss/Boards, I'm afraid that I was misunderstand what's you mean for some words, So I want to confirm some questions again, hopefully you can give a definite response to me, thanks!

First, As you told on the license, our company can't supply any end user's information to you because of the confidential agreement between our company and customers, So you need to find a way to get the license, now my question is "if you can't get the license, I want to know if you can also accept the order and have a good method to shipping these products to HK safely?".

Second, As you told that your payment is 100% prepayment via wire transfer, So my questions is " Can you pls let us know if you have other more better payment terms for choice? ".

Third, As you told that it's a illegal business if no the license, and the deal is not protected by Law, So my question is "if there is any accidents during carry out the Order, How to guarantee you can return all money to us safely ? ".

Awaiting your definite & earliest reply, so that I can make a full report & explained to our Boss/Boards ASAP!

Have a great day!

Best regards,
Richard

50.       On November 3, 2017, the HSI UCs received another email from LI.  In the email, as LI had discussed with the HSI UCs during the November 1, 2017 Skype call, LI provided UC-1's name, undercover company name, and undercover telephone number as a "Scammer" who had caused LI to lose money on a previous deal.  In the email, LI admitted to previously sending emails as "Michael Wilson."  Below is the November 3, 2017 email that the HSI UCs received from LI.

Dear [UC-2],

Thank you so much for your kind reply!

With regards to your kind feedback, I will make a full report & try my best to explain to our Boss/Boards, thanks!

Below pls find The SCAMMER details information, thanks!

Company Name: [UC-1's Company used to accept the wire transfer from LI]
Contact Person: [UC-1]
Cell: [UC-1's telephone number that was used to communicate with LI on a telephone call]

Note: [UC-1] is working for the [IS] Company, At first, my colleague " Michael " finds the [IS] Company, and contact with him, for some reason, I replaced " Michael " to continue to contact with him in the name of " Michael ", and we finally reached the agreement, and our company place an order to [IS] Company, BUT, [UC-1] asked our company place the order to the [UC-1 Company], and payment to the [UC-1's Company], but not The [IS] Company, I forgot what's the reason, Anyways, our company final agreed.

If you want to know more about the SCAMMER, pls feel free to contact us, thanks!

Have a great day!

Best regards,
Richard

51.    On November 15, 2017, the HSI UCs participated in a second Skype voice call with LI, using LI's Second Skype Account. HSI recorded the second Skype voice call. Prior to the call, UC-2 informed LI that a Mandarin-speaking associate would be present to interpret. HSI wanted to have a Mandarin-speaking interpreter on the call to make sure there was no confusion, as LI speaks English as a second language. For this call, the HSI UCs had an undercover Mandarin-speaking law enforcement agent acting as an interpreter on the call. During their conversation, LI spoke Mandarin. LI discussed the payment terms with the HSI UCs and stated that his supervisors would not pay the total invoice until the Intersil Part No. ISL705ARHVF and Cobham Part No. UT28F256QLET were delivered to Hong Kong. LI stated that he explained to his supervisors that the HSI UCs could go to jail if they were caught sending the electronics without a license and acknowledged that the export of the electronic components to the PRC would be illegal. LI suggested meeting the HSI UCs in a neutral country where they could exchange the electronic components for cash. LI and the HSI UCs agreed to further discuss the matter on a later call.

52.    Between November 15, 2017, and December 19, 2017, the HSI UCs and LI exchanged a series of emails discussing the payment and order of the items. During the emails, LI decreased his initial order to just 50 of the Intersil radiation-hardened supervisory circuits, Part No. ISL705ARHVF, and no longer requested Cobham Part No. UT28F256QLET-45UCC. LI explained that his "Boss/Boards" were willing to place an order for the reduced amount as a "trial" to ensure that the UCs could deliver the products to Hong Kong. Your Affiant knows that LI's decision to decrease the order to 50 Intersil, Part No. ISL705ARHVF after initially discussing an order of Intersil and Cobham

components was similar to how LI decreased his order from UC-1 after initially discussing a larger order.

## D. HSI Identifies "Richard Lee" and "Michael Wilson" as LI.

53.     On December 19, 2017, the UCs conducted another Skype call with LI; however, this time, LI agreed to participate in a Skype video call. HSI recorded the Skype video call.   During the video call, the same undercover Mandarin-speaking law enforcement agent was present to translate for the UCs and LI.   During the call, the UCs discussed with LI his decision to substantially reduce his order.   At the end of the call, LI stated that the reduction in his order and the requirement of only a 50% prepayment were his company's final terms.   During the video call, the UCs were able to clearly see LI's face.   The UCs, and your Affiant, have positively identified LI, using the alias "Richard Lee," during the December 19, 2017 video call as the same person who used the alias, "Michael Wilson, and spoke with UC-1 during the May 5, 2017 Skype video call.

54.     Between December 20, 2017, and January 30, 2018, UC-2 and LI exchanged a series of emails.   UC-2 informed LI that LI's requested order without a license was "illegal," which is why the UCs required that LI had to pay more up front.   LI stated that he did not think UC-2 would go to jail if he was caught and that LI's "Boss/Board" would not approve of the up-front payment terms.   LI's last communication regarding the order of the electronic components was on January 30, 2018.   UC-2 stopped receiving emails from LI between January 31, 2018, and May 28, 2018.

55.     On May 28, 2018, UC-2 received an email from LI who stated that he had some "bad things happened…"   In response to LI's statement, UC-2 inquired as to whether LI would be interested in traveling to the United States, meeting UC-2 in-person, and working for UC-2's company.   LI agreed and asked UC-2 for a letter of invitation to aid in his application for a U.S. visa.   UC-2 asked that LI send UC-2 his full name, passport number and address to complete the letter.   LI emailed UC-2 and stating his real name was "Tao Li."   In the email, LI provided his date of birth and Chinese passport number.   LI agreed to visit UC-2 at a later date in the United States to discuss working for UC-2.

**E.       HSI Confirms that LI Did Not Obtain the Applicable Exports Licenses.**

56.       On August 3, 2018, your Affiant received a report from the DoC regarding the existence of any prior export licenses for "Michael Wilson," "Richard Lee," "Tao Li," and his associated businesses identified as "Nick International Limited," "Huashun International Logistics Co. Ltd.," "Strategic Electronics Corporation," "Shaanxi Nick Import & Export Co. LTD," and "Shanghai Pan Long Import & Export Co. Ltd." DoC returned a list of five approved licenses under "Tao Li." Your Affiant reviewed the five approved licenses and learned that none of the licenses were approved for items classified under ECCN 9A515 (category for spacecraft or related commodities) or ECCN 3A611 (category for military electronics). As a result, none of the five approved licenses were for items that are space grade or military applications, and thus would have a policy of denial to the PRC. Although the licenses matched LI's name, there was no way to confirm whether it is the same person. The data obtained from the DoC provides no biographic identifiers, which make it impossible to verify the applicant's true identity. Furthermore, your Affiant has learned through open source indices that LI is the second most common surname in the PRC, only less common that the surname "Wang."

57.       Additionally, the DoC listed one approved license from Shanghai Pan Long Import & Export Co. Ltd., the company listed on the wire transfer for LI's payment while using the alias "Michael Wilson." The license for from Shanghai Pan Long Import & Export Co. Ltd. was approved in 2010 and was for an "Electrical Thermal Analysis Instrument," classified under ECCN 6A003. Your Affiant knows that Category 6A003 of the CCL lists export controls for "Cameras, systems or equipment, and "components" and is not restricted for export to the PRC. After reviewing the export data, your Affiant could not conclude that LI or any of his aliases were affiliated with the export that was subject to the 2010 license.

## CONCLUSION

58.       I believe the facts stated above show that there is probable cause to believe the following:

- Between at least December 12, 2016, and January 30, 2018, LI has contacted multiple U.S.-based individuals and companies, including the IS, UC-1, UC-2, and UC-3, to purchase various electronic components, some of which are specifically for space and military grade application, to be shipped to the PRC without obtaining the necessary export licenses.

- In doing so, LI has used multiple alias including, "Richard Lee" and "Michael Wilson." HSI has confirmed that the individual who appeared on a Skype video call as "Michael Wilson" and the individual who appeared on a Skype video call as "Richard Lee" are the same individual. Additionally, LI, using the alias, Richard Lee, admitted to UC-2 that he used the name "Michael Wilson" to communicate with UC-1. Lastly, the content of the emails sent by LI under "Michael Wilson" and "Richard Lee" were similar in context and syntax, and the names "Richard Lee" and "Michael" are used together in the purchase order documents and wire transfer record in this investigation.

- LI is conspiring with other unknown individuals to attempt to purchase the controlled items and has indicated through his email communications that he is being directed by his "director," "customer," and "Boss/Board." LI also described prior instances where he received items from U.S. based distributors who had smuggled the parts successfully to LI.

- Based on LI's communications with the undercover agents, LI has knowledge of U.S. export licensing requirements concerning the export of the requested items and was overt in his attempt to circumvent these requirements. During email and Skype conversations listed within this Affidavit, LI refused to provide the end use or end user multiple times, claiming that providing this information would not result in a license.

- LI actually purchased some of the controlled items, intending that they were to be exported without a license contrary to law, when he provided a $5,742.00 payment

from a bank located in the PRC to a U.S. bank in Phoenix, Arizona, in furtherance of the smuggling scheme.

- LI has at no time attempted to obtain or receive an export license for the items he requested listed in this Affidavit.

- LI knowingly and willfully conspired with unknown members of his organization and referred to "his customers" during undercover communications.

59.     Based on the aforementioned facts, your Affiant believes there is probable cause that Tso LI a.k.a Michael Wilson a.k.a. Richard Lee has committed violations of 50 U.S.C. § 1705(a) and (c) (Conspiracy to Commit Violations of IEEPA), and 18 U.S.C. § 554(a) (Smuggling, or Attempting to Smuggle, Goods from the United States).

Nicholas Barabatis
Special Agent
Homeland Security Investigations

Subscribed and sworn to before me
this: ___14th___ day of August, 2018.

HONORABLE BRIDGET S. BADE
United States Magistrate Judge